**UNITED STATES of America,**
**Appellee,**

v.

**Nelson Cornelious DRUMMOND,**
**Appellant.**

**No. 310, Docket 28710.**

United States Court of Appeals
Second Circuit.

Argued Jan. 28, 1965.

Submitted to the in banc Court
May 26, 1965.

Decided Dec. 2, 1965.

Waterman, Smith and Anderson, Circuit Judges, dissented.

John S. Martin, Jr., Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., Andrew T. McEvoy, Jr., Vincent L. Broderick, Asst. U. S. Attys.), for appellee.

Orison S. Marden, New York City, (Anthony F. Marra, Charles Nelson Brower, P. B. Konrad Knake, Jr., New York City), for appellant.

Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and ANDERSON, Circuit Judges.

KAUFMAN, Circuit Judge.

On this appeal, which raises multiple challenges to the conviction of Nelson Cornelious Drummond for conspiracy to violate the Federal Espionage Act, we are called upon to decide whether the trial court wrongly admitted into evidence inculpatory statements made by the defendant during periods prior to and following his arraignment in which he was allegedly denied the assistance of counsel and thus deprived of rights secured to him under the Sixth Amendment to the Con-

stitution. Because this appeal raises vital questions of judicial administration of the criminal law requiring interpretation of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), we directed consideration *in banc.*

Count 1 of the indictment charged Drummond with conspiracy to deliver national defense documents to four named agents of the Soviet Union in violation of the Federal Espionage Act, 18 U.S.C. § 794(c). Count 2 charged an attempt to deliver such documents to the agents in violation of 18 U.S.C. § 794(a). Drummond's first trial ended in a mistrial when the jury was unable to reach a verdict on either count. In his second trial, the jury found Drummond guilty of the conspiracy charge of Count 1 but was unable to reach a verdict on Count 2. District Judge Murphy sentenced Drummond to life imprisonment.

Subsequent to his conviction, Drummond moved for a new trial under Fed. R.Crim.P. 33 on grounds that newly discovered evidence showed his arrest to have been in violation of the Fourth Amendment to the Constitution, and that items seized on arrest and inculpatory statements made after arrest were therefore "tainted" and inadmissible at trial. Judge Murphy denied the motion.

In addition to the asserted denial of counsel, Drummond's appeal from his conviction raises two other grounds for reversal: (1) the jury was erroneously charged with respect to the question of whether the conspiracy pertained to documents "relating to national defense"; and (2) the trial court failed to charge the jury that the requirements for a finding of treason, as set forth in Article III, Section 3 of the United States Constitution, must be met in a case of this kind, and the evidence failed to meet such requirements.

Drummond's appeal from the judgment of conviction and the District Court's denial of the motion for a new trial are consolidated here. We have examined the record in this espionage case resulting in a life sentence with extraordinary care. We affirm Drummond's conviction and the District Court's denial of the motion for a new trial. We conclude that the inculpatory statements in this case were properly received in evidence. We find no merit in Drummond's other challenges to the trial court's evidentiary ruling and charge.

## I. THE EVIDENCE

The record describes a tawdry scheme of espionage for hire. Over a period of five years, from 1957 to 1962, while on duty with the U. S. Navy in Europe and the continental United States, Drummond passed classified military materials to Soviet agents in return for payments totaling $24,000. The scenario is replete with the cliches of international intrigue: furtive meetings, night chases, secret surveillance, spy props.[1]

The evidence crucial to Drummond's conviction was largely derived from his own admissions following arrest and preceding trial. In late 1957, Drummond was approached by a Soviet agent while on duty with the United States Navy in London. At the time Drummond was heavily in debt, and the agent exploited his knowledge of Drummond's financial difficulties to enlist him as a spy for the Soviet Union. Drummond first procured a Navy identification card for the Soviet agent and was paid 250 pounds. Once committed, Drummond regularly supplied various Soviet contacts with classified documents from the files of the Eastern Atlantic and Mediterranean Headquarters of the United States Navy in Lon-

---

1. By way of example: In May 1958, on instructions from a Soviet agent in Europe, Drummond was directed to make contact with Soviet agents in the United States by appearing at 125th Street and 7th Avenue in New York City at 9 p.m. on the first Saturday of the month following his arrival in the United States, wearing a horsehead cuff link in his button hole, and walking south on 7th Avenue until somone asked him directions to the Savoy Ballroom.

don. On one occasion, plagued by debt, he actively sought out his contacts at the U. S. S. R. Embassy and was severely reprimanded by a Soviet agent.

In the spring of 1958, Drummond was investigated by the office of U. S. Naval Intelligence, but, forewarned by his Russian contacts, he halted his espionage activities temporarily and escaped detection. Shortly thereafter he was reassigned to the United States. Establishing contact with the United States branch of the Soviet espionage network, Drummond continued passing classified documents for the next four years. His intermediary was one Esther Katz, whom he telephoned when he wished to contact the Soviet agents. He met regularly at prearranged rendezvous points in the metropolitan New York area with three Soviet agents attached to the Soviet Mission to the United Nations, Mikhail Stepanovich Savelev, Vadim Vladimirovich Sorokin, and Evgeni Mikhailovich Prokhorov (each known to Drummond only as "Mike"), who supplied him with special tools of the espionage trade: hollowed-out magnets, miniature cameras, flash paper, invisible writing materials.

During this period Drummond regulary removed and sold to the Soviets documents from the classified files of the U. S. S. Caperton, under repair in the Boston Navy Yard, and, after May 1960, from Mobile Electronics Technical Unit Number 8, located at Newport, Rhode Island, to which he was assigned as a Yeoman First Class, processing and filing classified documents including those designated "COSMIC Top Secret." [2]

Living beyond his legitimate earnings, Drummond received payments averaging $500 for each delivery of classified documents, which he used to repay heavy personal debts. In November 1961, on de-

mand, he received a special payment of $6,000 from his Soviet contact with which he purchased a bar and grill in Newport, Rhode Island. He received a second special payment of $4,000 in August 1962. On several occasions, Drummond openly sought out his Russian contacts at their United Nations offices. As in London, he was reproached for his recklessness.

The F. B. I. began surveillance of Drummond on August 13, 1962. That day, an F. B. I. agent observed him driving toward New York City on the New York Thruway and later entering an apartment building on Central Park West. On September 7 and 8, Drummond was observed travelling between the Newport Naval Base and New York City. On September 8, an F. B. I. agent photographed one of the Soviet agents in the same apartment building. Between September 6 and 9, F. B. I. agents searched Drummond's office at Newport and found four classified documents missing. On September 9, the agents searched Drummond's car and discovered eleven classified documents, including the missing four. Based on these observations, the F. B. I. obtained an arrest warrant charging Drummond with conspiracy to commit espionage.

On September 28, 1962, after close of the workday, two F. B. I. agents monitoring Drummond's office through a closed-circuit television device and one agent hiding behind a bookcase in the office observed Drummond removing papers from a classified file and placing them in his carrying case. He then entered his car and drove on the Connecticut Turnpike and Boston Post Road to a diner in Larchmont, New York, where he was met by Soviet agent Prokhorov and another member of the Soviet Mission to the

2. The designation COSMIC is classified and defined as follows: "COSMIC—The word COSMIC is a marking which when applied to a document signifies (a) that the document is the property of NATO and may not be passed outside the organization except by the originator or with his consent * * * (b) that the document is subject to the special security protection outlined in * * * [highly classified] procedures.

"The marking COSMIC will be applied to all copies of TOP SECRET documents prepared for circulation within NATO. The marking COSMIC will not be applied to documents graded lower than TOP SECRET." OPNAV Instructions—05510.46 alpha.

United Nations. After observing the three men converse for a few minutes, F. B. I. agents on the scene placed Drummond under arrest. A search of his car incident to the arrest disclosed a loaded pistol and a number of classified national defense documents, including manuals for installation and maintenance of anti-submarine guided missiles, electric bomb fuses, and aircraft bombs. A list identifying the various documents was found on Prokhorov. Experts at trial testified that these documents could be used by hostile governments to develop counter measures which might neutralize American weapons systems or even redirect their courses to destroy United States installations. Information contained in the documents could also be utilized to modify an enemy's electronic equipment so it could operate beyond the range of American detection instruments.

Drummond took the witness stand in his own defense and admitted many of the meetings with the Soviet agents. He acknowledged the delivery of various defense documents to Soviet agents in return for more than $20,000, but insisted that none of the documents contained information known to him to be classified, claiming instead that he believed they had actually been declassified without the change being noted on the papers. He denied that he had removed from Navy files the documents found in his car by the F. B. I. the night of his arrest. He admitted removing other documents from Navy files earlier that evening but contended that he planned to use them to lure Soviet agents into his car in order to murder them.

The guilty verdict on the conspiracy count demonstrates that the jury rejected the incredible concoction that the documents delivered over a period of more than four years were of no value to the Soviets, and that the Russians were duped by Drummond's machinations. Rather, as Judge Murphy stated in denying appellant's motion for a new trial, "more competent proof of a conspiracy would be difficult to imagine."

## II. DRUMMOND'S ADMISSIONS

Drummond's main contention on this appeal is that his inculpatory statements made following arrest and preceding trial should not have been admitted into evidence because they were made at a time when he was deprived of the aid of counsel. He argues, therefore, that these admissions were obtained in violation of his Sixth Amendment constitutional right to counsel as interpreted by the Supreme Court in Escobedo v. State of Illinois and Massiah v. United States. ·

We note first that the testimony concerning these admissions was received in evidence without objection at the time of its introduction. Not until both prosecution and defense had rested their cases did Drummond's counsel move to strike the evidence on the ground the admissions were involuntary, citing the absence of counsel as a factor on the issue of voluntariness. No claim was made that Drummond had been denied a constitutional right of access to counsel at the time of the questioning.

Had Drummond's trial occurred subsequent to the Supreme Court decisions in Massiah and Escobedo, supra, under principles enunciated by this Court in United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965), appellant would be precluded from raising the issue on appeal.

We are persuaded, however, to consider this issue here (despite the omissions below) because we would be compelled to overturn Drummond's conviction if his critical admissions should have been excluded.

Analysis of the legal problems presented on this appeal is aided by subdivision of these admissions into four categories, related to the time and circumstances in which they were made: (1) the spontaneous admissions made immediately after his arrest during the trip to F. B. I. headquarters; (2) the pre-arraignment statements made at the F. B. I. headquarters during the early morning hours of September 29, 1962; (3) the post-arraignment interviews at the Federal House of Detention on September 29, and

in early October; and (4) the post-indictment interviews held with counsel's consent at the Federal Courthouse in December and January.

*Spontaneous Admissions Immediately Following Arrest*

Immediately after arresting Drummond in the Larchmont Diner parking lot at 11:23 p.m. on September 28, 1962, F. B. I. agents Johnson and Mannion placed him in their car and drove directly to F. B. I. headquarters located at 69th Street and Third Avenue in Manhattan. After they were in the car for approximately ten minutes, Drummond spontaneously volunteered that "the best thing" for him to do would be to "spill the beans." He suggested that the agents proceed quickly to Apartment 12–R at 400 Central Park West, in order to apprehend his Soviet contacts, and handed them a card bearing the phone number of his emergency contact, Esther Katz. No further conversation occurred in the car. He was photographed and fingerprinted at Headquarters at about 12:25 a. m. and turned over to Special Agents Palguta and Gamber, who conducted subsequent interviews.

*Pre-Arraignment Interview*

Agents Palguta and Gamber identified themselves to Drummond, and Palguta advised him, in accordance with established F. B. I. procedure,[3] that he did not have to make any statements if he did not wish to do so, that anything he said could be used against him, and that he had a right to counsel. After informing Drummond of the grounds for his arrest, they questioned him about the naval defense documents found in his car, the nature of the documents passed to the Russians, and the identity of his contacts, both Soviet and American. Without hesitation, Drummond recounted the history of his association with the Soviets. Except for minor variances in dates and places of meetings, Drummond's account of his espionage activity for almost five years closely paralled that given in later interviews and at trial. During this interview, however, in contrast to his testimony at trial, Drummond frankly admitted that he furnished the Russians with classified documents.

At no time during his first trial did Drummond claim that he requested and was denied the assistance of counsel during this interrogation. At his *second* trial, however, Drummond claimed that during this initial interview with the F. B. I. agents he asked for permission "to phone counsel and my wife or my wife and they told me I couldn't do it." "They told me", he continued, "that when I got to the courthouse at Foley Square, I would be granted the opportunity to use the phone and not to worry." Agent Palguta's detailed log of the interview, which was marked for identification and given to defense counsel at the trial, but not introduced in evidence, revealed that it was not until 3:30 a. m., five minutes before the interview at headquarters terminated, that Drummond inquired if he could call his wife. "He was told," according to Palguta's notes, "he could not call his wife at this time since it was necessary to proceed to U. S. Commissioner's office for arraignment." [4]

3. See Hoover, Civil Liberties and Law Enforcement: The Role of the F. B. I., 37 Iowa L.Rev. 175, 182 (1952).

4. At trial, Palguta was shown the F. B. I. log of the September 29 interview (GX 67 for identification) and confirmed that the initials on it were his. This log, as well as documents pertaining to other interviews, were turned over to defense counsel pursuant to the latter's Jencks Act request. Since Drummond never contended at trial that he had been denied his constitutional right of access to counsel, the government had no reason and was, therefore, denied the opportunity to offer the log into evidence, as it undoubtedly would have done if the point had been raised. Cf. United States v. Ladson, 294 F.2d 535 (2d Cir. 1962); United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965). To avoid penalizing the government for failing to respond at trial to a contention which we are permitting to be raised for the first time on appeal, thus disadvantaging the government, we think it only fair and just that we exercise our power to consider the exhibit marked for identification. See United States v. Tane, 329 F.2d 848 (2d Cir. 1964).

Drummond was arraigned before a United States Commissioner in the United States Courthouse, Foley Square, at 4:20 a. m., September 29. Pursuant to Fed.R.Crim.P. 5(b), he was (a) formally advised of the complaint against him, (b) told that he was not required to make any statement, (c) advised that any statement made by him might be used against him, and (d) advised that he had a right to counsel and a preliminary examination. Bail was fixed at $100,000, further proceedings were postponed, and, in default of bail, Drummond was taken to the Federal House of Detention.

*First Post-Arraignment Interview*

During the afternoon of September 29, special agents Palguta and Gamber received a handwritten note from Drummond stating, "I remember her name. Please see me. Drummond. Also bring map of northern New York State. I think I can locate the camp." The note related to Esther Katz and to an incident previously disclosed to F. B. I. agents in which Drummond had sought to contact her. When the agents arrived at West Street Detention Headquarters at 7:00 p. m., Palguta promptly asked, "Drummond, do you have an attorney?" Drummond said no, adding that a lieutenant at the House of Detention had refused to let him use the telephone that morning and had told him "he would have to go through the proper authorities to put in a chit before he could use [it]." When questioned about this incident by Drummond's counsel at trial, Palguta stated that he did not interpret Drummond's remarks to mean that he had been refused permission to contact an attorney.[5] Palguta then advised Drummond of his right to remain silent and to consult

counsel.[6] At this time the agents handed appellant a statement purporting to incorporate in writing the information given by him the night before. Drummond was asked to examine the statement, make any corrections he desired, and to adopt it if it was correct. He read and edited the statement from 7:15 to 7:38, then signed this statement and another statement reciting that he had initiated the request to be interviewed by the Bureau's special agents at the Federal House of Detention.

The discussion at this second interview centered on Drummond's Russian and American contacts, places they met, and methods used for establishing contact among them. There was no evidence that at any time during this interview, or in any earlier or later interview, Drummond objected or showed any resentment at being questioned without the assistance of a lawyer. Indeed, the record indicates he was told by Palguta at the outset of the interview, "Drummond, any time you don't want to be interviewed you just say so and I will not come back here."

*Subsequent Post-Arraignment Interviews*

Similar interviews, originated at Drummond's request and lasting from one to four hours, were conducted at the Federal House of Detention on October 2, 3, and 4. The agents commenced each session by advising Drummond of his right to be silent and to consult a lawyer, and prior to each interview he was given an opportunity to communicate by telephone with his wife. Indeed, on October 2, it was Drummond's wife who called Palguta stating that Drummond wanted to see him. At no time did he resist

5. Palguta's interview notes, introduced at trial, read as follows: "does not have an attorney; request to call an attorney this AM but lieutenant refused; lieutenant said [blank]. Advised of right, 7:05 p.m." Palguta testified, with respect to these notes, that Drummond "never told me he was refused the right of an attorney." Rather, according to Palguta, Drummond said that "the lieutenant refused to let me use the telephone, or something to that

effect—not that he was refused an attorney, but he was probably referring to the lieutenant or whoever it was in charge of the prison and he was refused the use of the telephone." Palguta concluded, "That was not my concern at that particular time."

6. This customary F. B. I. procedure was used on each occasion Drummond was interviewed.

answering questions or signing statements without the aid of a lawyer. He willingly drew sketches of the espionage devices he had used, identified photographs of his Soviet contacts (correcting an error he had made when he was first shown the pictures at F. B. I. headquarters), and generally assisted the agents to the fullest extent. Drummond's testimony at trial unequivocally established that he "started cooperating with the F. B. I. agents from the time [he] was arrested." He utilized the intervals between interviews to recall additional details which he then volunteered to the agents, relating not only to his own espionage activities over many years, but also to activity of other Soviet agents currently operating in this country.

*Post-Indictment Admissions*

The indictment against Drummond was returned on October 5. Three days later, represented by retained counsel, he was arraigned in the United States District Court, Thereafter he was represented by retained or court-appointed counsel.

Approximately two months after the indictment, at the request of the Government, Drummond and his counsel, William Esbitt, a former Assistant U. S. Attorney, consented to further interviews. These were held at the Federal Courthouse on December 3, 4, and 11, 1962 and January 21, 1963. During this series of interviews Drummond was able to give the investigating agents more precise information concerning his relationship with Esther Katz and the dates and places of his exchanges with the Russian agents. At trial, Drummond stated that he was never threatened in any way during the interviews; his participation was motivated by a desire to make amends to the Government he had betrayed. "Anything you think I can do," he said at the outset of the December 3 interview, "tell me and I will do it."

The challenge made to the admissibility of information obtained in these interviews is essentially not one of absence of counsel but rather that the evidence was the tainted consequence of the allegedly inadmissible admissions made in the earlier interviews, where counsel was not present.

### III. THE GOVERNING LEGAL PRINCIPLES

The scope and nature of a criminal defendant's Sixth Amendment right to counsel currently preoccupies the attention of law enforcement officials, prosecutors, defense lawyers, judges, and scholars. How absolute is the right and at what point in the criminal process does it attach—on the street, in the squad car, in the stationhouse, before the committing magistrate, during detention, or in court? Under what circumstances, if any, can it be waived? What are the consequences of its denial?

Obviously we cannot—and, since we are constitutionally limited in our jurisdiction to deciding actual cases and controversies, we should not—attempt to decide all of these vital questions now. But the uncertainty currently plaguing police, prosecution and courts would seem to compel us, to an even greater degree than is ordinarily the case, to articulate the basic principles and policies which underlie the result reached here. The genius of the common law lies in the process of reasoned elaboration from past precedent; unless we explain our decisions of today with all the precision and exactitude at our command, today's holdings will become but simple fiat and will provide no guidelines for tomorrow's problems.

*Is There a "Public Policy" Against Confessions?*

██ Primarily because our society prizes values other than convicting the guilty, it is now established law that confessions obtained under circumstances regarded as socially or morally indefensible cannot form the basis of criminal convictions. The dominant principle has been that a man should not be compelled to incriminate himself against his will, and the cases have taught us that it makes little difference whether a man's will be broken by physical brutality or more subtle psychological pressures.

■ Hence, the privilege against compulsory self-incrimination of the Fifth Amendment and the due process clause of the Fourteenth Amendment have been repeatedly invoked to outlaw the use of confessions tainted by oppressive police behavior. More recently, we have been taught that this is not the only constitutional restriction upon the use of confessions in criminal prosecutions. Cases such as Escobedo v. State of Illinois have made it clear that there is a point— whether or not a prosecution has been *formally* commenced by indictment or arraignment—when the Sixth Amendment right attaches and an accused is entitled to the assistance of counsel. If counsel is denied after that point has been reached, confessions subsequently obtained must be excluded if the right to counsel is to be given meaning and respect.

■■ But the fact that the use of confessions must necessarily be restricted in particular instances hardly evidences a "public policy" against the use of confessions *per se*. Indeed, there *can be* no sound public policy requiring law enforcement and prosecutory agencies affirmatively to prevent or deter individuals from confessing that they have engaged in unlawful conduct. Nor can there be any moral imperative that would compel society to guarantee that an accused can never *voluntarily* contribute to his own conviction, or indeed, that innocent suspects can never exculpate themselves promptly.[7] Neither the privilege against self-incrimination nor the right to counsel was designed affirmatively to encourage sealed lips. They were intended, at least in part, to protect the innocent (as well as the guilty) from immoral and unethical methods, incompatible with humane law enforcement, which act as stimuli for confessions.

In this regard, the Supreme Court of California has unanimously and pointedly noted that Escobedo and its progeny were aimed at restraining law enforcement officers "from the use of inquisitorial techniques in seeking to prove the charge against the accused out of his own mouth. They were never intended to discourage a defendant from volunteering to the police his complicity in the perpetration of a crime nor to prohibit the police from receiving and acting upon such confessions." People v. Cotter, Cal., 46 Cal.Rptr. 622, 405 P.2d 862 (1965).

■ Confessions are not suspect *per se*; it cannot be said that an individual who confesses has by that deed alone acted unreasonably or under compulsion. Our experience leads us to believe that often the conscience of an accused prods him to confess. Alternatively, expectation that independent investigation will lead to evidence sealing a conviction or calculation of a *quid pro quo* in the form of a lenient sentence, can motivate a course of full disclosure. Frequently, in the case of a reasonably intelligent man like Drummond, previous exposure to society's religious, ethical and moral values conditions a cooperative response to a confrontation with authority. See Gaylin, Psychiatry and the Law, 8 Columbia University Forum, 23, 25 (Spring, 1965). Prof. Kamisar has stated this concept thus: "damaging admissions are also the product of conscience, remorse, even calculation." Kamisar, in Magna Carta Essays; Criminal Justice in Our Time, 1, 10 (U. of Va. Press 1965).

■ The point to bear in mind is this: the social policies underlying the privilege against self-incrimination and the right to counsel have, at times, required that certain confessions be held inadmissible in particular criminal trials. But this by no means requires that all confessions—with or without counsel— must necessarily be excluded under any and all circumstances, or even that all admissions of an accused be regarded as somehow "suspicious" or unworthy of belief.

---

**7.** See generally Devlin, The Criminal Prosecution in England (1958). Cf. Ronayne, The Right to Investigate and New York's "Stop and Frisk" Law, 33 Fordham L.Rev. 211 (1964).

## The Scope of the Right to Counsel

 This Court does not view, as Drummond would have us, the absence of counsel at the time admissions are made as inevitably compelling a finding of inadmissibility.[8] We are unaware of any judicial or legislative mandate compelling so extreme a rule. See Long v. United States, 119 U.S.App.D.C. 209, 338 F.2d 549 (1964). Recent holdings by other courts of appeals, concededly extending the exclusionary rule with respect to voluntary pre-trial utterances by criminal defendants, do not stamp as inadmissible all statements made by an uncounseled person in custody. Jackson v. United States, 119 U.S.App.D.C. 100, 337 F.2d 136, 141 (1964) (Burger, J., concurring), cert. denied, 380 U.S. 935, 85 S.Ct. 944, 13 L.Ed.2d 822 (1965). See also Otney v. United States, 340 F.2d 696, 703 (10th Cir. 1965).

And, in its very recent decision in People v. Price, 46 Cal.Rptr. 775, 406 P.2d 55 (1965), the Supreme Court of California explained its earlier ruling in People v. Dorado, 62 A.C. 350, 42 Cal. Rptr. 169, 398 P.2d 361, barring the defendant's confession because among other things he had not been effectively informed of his right to counsel or to remain silent and had not waived these rights. "[D]enials of due process in Massiah, Escobedo and Dorado are not based on the fact that counsel was not present at the time the suspect made incriminating statements, but on a combination of circumstances, one of which was the absence of counsel," 46 Cal.Rptr. 775, 780, 406 P.2d 55, 60. The Court then interpreted its holding in Dorado and that of the Supreme Court in Massiah and Escobedo thus: "It is apparent from the foregoing that the basis for the prohibition against the use of incriminating statements is police action which results in a violation of one's constitutional rights guaranteed by 'due process.'" 46 Cal.Rptr. 775, 781, 406 P.2d 55, 61. Our own rulings in United States v. Cone, 354 F.2d 119 (2d Cir. 1965), and United States v. Robinson, 354 F.2d 109 (2d Cir. 1965), made clear that the exclusionary rule urged by appellant would be unwise and is not compelled by Escobedo and Massiah. We decline to adopt it.

 We can see no reason rising to constitutional proportions requiring a *per se* rule barring the police from a reasonable period of privacy with a reasonably intelligent man who has just been placed under arrest and advised of his rights to remain silent and to counsel. The "compelling necessity" of preliminary screening interrogation "has been judicially recognized as sufficient justification, even in a society which, like ours, stands strongly and constitutionally committed to the principle that persons accused of crime cannot be made to convict themselves out of their own mouths." Culombe v. Connecticut, 367 U.S. 568, 571, 81 S.Ct. 1860, 1862, 6 L.Ed.2d 1037 (1961) (Frankfurter, J.).

 In United States v. Middleton, 344 F.2d 78 (2d Cir. 1965), we acknowledged the need for a reasonable delay in which the police can check out stories of the accused and run down leads before presenting the accused to the committing magistrate. Such delays can protect the innocent as well as help to convict the guilty. We held in Robinson that the police may conduct brief preliminary screening of an accused without counsel present. It is the "sum total of the circumstances * * * during the time [the accused] was without counsel," Crooker v. State of California, 357 U.S. 433, 440, 78 S.Ct. 1287, 1292, 2 L.Ed.2d 1448 (1958), which determines whether

---

8. "It is one thing to say: this defendant's confession was illegally coerced because he was illiterate, unadvised of his rights, held incommunicado, subjected to threats, beaten, or whatever. It is quite another to say: no person who is arrested may be questioned by the police until he has been advised of his right to remain silent and to have the assistance of a lawyer and until he has had the chance to see a lawyer if he wants to." Packer, Policing the Police: Nine Men Are Not Enough, New Republic, Sept. 4, 1965, p. 18.

there has been a fundamental deprivation of rights.[9] The coercive or noncoercive context in which the admissions were made; i. e., the spontaneity or responsive nature of the statements, the physical conditions of interrogation, the period lapsing after arrest before the statements were made, the intelligence level of the defendant, his legal sophistication, his subjective state of mind and health are all relevant to the ultimate determination. We must look behind the surface formalities; our Constitution guarantees fundamental rights, not the utterance of some judicially-ordained shibboleth. A decision based on constitutional fiat, therefore, is not a desirable method for reaching an informed resolution of the pre-trial access to counsel problem. This is precisely the sort of question that can best be answered after the investigative, experimental, and interest-balancing methods of the legislature are utilized.[10]

IV. APPLICATION OF GOVERNING PRINCIPLES TO THIS CASE

We proceed to decide whether Drummond's questioning was conducted in such fashion as to render inadmissible admissions made in the absence of counsel. In analyzing the various factual circumstances under which Drummond was interrogated and in applying the appropriate rule of law, it will be helpful to retain the distinction between: (a) the spontaneous admissions at the time of Drummond's arrest; (b) the pre-arraignment statements; (c) the post-arraignment interviews; and (d) the post-indictment sessions.

*Spontaneous Admissions*

Drummond's first admissions, in the F. B. I. car on the trip from Larchmont to Bureau headquarters, were unsolicited and were volunteered in all respects by Drummond, as the previous discussion has shown. They do, however, serve to indicate his early decision to cooperate with the authorities and are of significance in assessing his state of mind during subsequent periods of interrogation. His spontaneity strongly suggests that his cooperative attitude during the next several months was rooted in a free, voluntary decision made at the time of his apprehension or even, as discussed below, pursuant to a predetermined plan.

9. Our recent decision in United States v. Hall, 348 F.2d 837 (2d Cir. 1965), provides an analogue. There, appellant was arrested pursuant to a warrant and brought to F. B. I. headquarters. Eye witnesses' identifications of Hall as the kingpin in a confidence scheme virtually ensured his conviction for interstate transportation of securities taken by fraud. We held that there was no unnecessary and unreasonable delay in arraigning Hall because of questioning designed to elicit the location of stolen bonds. "Investigation was precisely the purpose of the detention here—indeed, investigation not to obtain evidence of Hall's guilt, of which there was already an abundance, but primarily to restore to the victim what he had feloniously taken from her." 348 F. 2d at 843.

10. James Vorenberg, Professor of Law at Harvard Law School, Head of the Office of Criminal Justice within the United States Department of Justice, and Reporter to the American Law Institute, has attested to the complexities of the issues involved in delineating the scope of the suspect's right to counsel:

"On first approach to these problems, one becomes aware that much of the literature is written by people whose views on these subjects are very strong and very clear and who perhaps resent any approach cluttered by complexities and uncertainties. Unfortunately, the problems of controlling crime have become agonizingly complex—as have so many problems of the world." Vorenberg, Police Detention and Interrogation of Uncounseled Suspects: The Supreme Court and the States, N.Y.L.J., Aug. 31, 1964, p. 4, Col. 1.

And, Professor Packer, urging legislative resolution of the problem, has written:

"Meanwhile, we can only hope that the Supreme Court will not use its carving knife in default of the legislature's scalpel to declare, for example, in the broad and unqualified terms in which its uncritical detractors and supporters mistakenly claim it has already spoken, that every person arrested for any crime must be provided with a lawyer before the police may ask him any questions." Packer, supra note 8, at 21.

*Pre-Arraignment Statements*

█ Drummond now claims that, during the preliminary interview at F. B. I. headquarters in the early morning of September 29, he asked Agent Palguta and was refused the opportunity to call both his wife and his lawyer. This assertion was made for the first time during Drummond's testimony at his second trial after Palguta had left the stand. But Palguta's official log of the interview, which was marked for identification and given to defense counsel during the trial for his examination, discloses that a request was not made until the last five minutes of the interview and that Drummond sought permission only to call his wife, *not* a lawyer.

There was plainly no probative substance to Drummond's unsupported allegation, and we find no basis in the record for ruling otherwise. But, even if Drummond had requested to call a lawyer as well as his wife at the time indicated in Palguta's log, in the chronology of events present here there can be no finding of prejudice to Drummond. Drummond was on the verge of being taken before the U. S. Commissioner for arraignment. Earlier in the evening he had been given the standard F. B. I. warning, including advice as to his right to counsel. And, Drummond was in no way intimidated by failure to comply with his alleged request for counsel. He was a thirty-four year old man of reasonable intelligence and undoubted craftiness. He had already made elaborate disclosures to the F. B. I. of his involvement with the Soviet espionage conspiracy. We are not prepared to hold that such a request—if it occurred—could vitiate these prior disclosures, particularly where there had been initial notification of his rights, the interview had proceeded for several hours without any prior request for counsel, and arraignment was imminent. The conclusion that any request was plainly an afterthought, and that Drummond's earlier admissions were made voluntarily with full knowledge of his rights, is reinforced by his continued, almost-compulsive, willingness to cooperate with his interviewers over the next several days.

We held in *Robinson* that, in the circumstances of that case, the accused's rights were not violated by a preliminary stationhouse screening interview, despite failure to advise the accused of his right to remain silent or to consult counsel. But here there was a clear notification of rights before questioning began. The pre-arraignment interview lasted less than four hours; the defendant, who arrived at headquarters about 12:30 a. m., was before the Commissioner by approximately 4:30 a. m. During the interview, he was not handcuffed, and his admissions were a continuation of those begun in the car on the way to the station. There were no untoward *Escobedo* tactics, no disintegration of his defenses under relentless and deceptive questioning or psychological battering, no atmosphere of isolation or incommunicado detention. Moreover, we find nothing inconsistent in Drummond's desire to "spill the beans" and any wish he might have expressed to contact his wife and a lawyer. In the circumstances of this case, we hold these pre-arraignment statements admissible.

█ The preliminary questioning of Drummond additionally was justified to expose and apprehend his co-conspirators and to gain an early assessment of the damage he had done his country's military security. In espionage cases, leads must be followed up immediately, or foreign agents, warned by their organizations' sensitive antennae, may vanish. As Chief Judge Lumbard so aptly stated in *Cone*:

> "the police should not be forced unnecessarily to bear obstructions that irretrievably forfeit the opportunity of securing information under circumstances of spontaneity most favorable to truth-telling and at a time when further information may be necessary to pursue the investigation, to apprehend others, and to prevent other crimes." 354 F.2d at 126.

█ Had Drummond asked for counsel at the beginning of the inter-

view when he was informed of that right, or had he plainly indicated a desire not to talk before counsel arrived, and then had the agents refused him access to counsel and questioned him relentlessly, the case might be different. Certainly we are not deciding that the police may lightly disregard an accused's request to consult counsel during pre-arraignment questioning, even where the questioning is legitimately motivated. In fact, the denial of a request to call counsel during a pre-arraignment interview may, in other circumstances, render any incriminating statements inadmissible. But, here where an intelligent defendant, fully warned of his rights, nevertheless clearly evinced a strong desire to cooperate and made elaborate disclosures before his earliest request for counsel, the failure to comply with his request at that time will not void the statements.[11]

Finally, we believe that there was a clear, knowing waiver of any right to counsel during this pre-arraignment stage of the interrogation.

■■■ Courts indulge every reasonable presumption against the waiver of fundamental constitutional rights, but it is well established that these rights may be waived. A waiver, however, can only have validity if it represents an intentional relinquishment or abandonment of a known right or privilege. Whether there has been an intelligent waiver must be determined *ad hoc,* depending in each case upon the particular facts and circumstances surrounding the event; the court must be mindful at all times of the background, experience and general conduct of the accused alleged to have waived the right. Johnson v. Zerbst, 304 U.S.

458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); see Johnson v. United States, 318 F.2d 855 (8th Cir. 1963), cert. denied, 375 U.S. 987, 84 S.Ct. 521, 11 L.Ed.2d 474 (1964). These principles were given recognition in Escobedo v. State of Illinois. The Court noted that "[t]he accused may, of course, intelligently and knowingly waive his privilege against self-incrimination and his right to counsel either at a pre-trial stage or at the trial." 378 U.S. at 490 n. 14, 84 S.Ct. at 1765. See also Jackson v. United States, 119 U.S.App.D.C. 100, 337 F.2d 136 (1964); Hayden v. State, 201 N.E.2d 329 (Ind. 1964); State v. Elam, 263 N.C. 237, 139 S.E.2d 601, 606 (1965). It is interesting to note, moreover, that despite the holding in United States ex rel. Russo v. State of New Jersey, 351 F.2d 429 (3d Cir. 1965), excluding all statements made in the absence of advice as to counsel, the same court later ruled that such rights may nevertheless be waived. Commonwealth ex rel. Craig v. Maroney, 348 F.2d 22 (3d Cir. 1965). Judge Forman, who concurred in Russo, wrote:

"It is clear beyond a doubt both that Craig knew of his right to have an attorney for consultation and that he knew no statement had to be given to the police. * * * Though not express, his decision to proceed without counsel was unfettered, intelligent, and unequivocal. The * * * facts of this case * * * constitute the waiver of a right previously secured." 348 F.2d at 31.

■■■ While applicable legal rules do not change merely because the accused is charged with espionage, Abel v. United States, 362 U.S. 217, 219–220, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), the question

11. We have no occasion to consider Drummond's further contention on appeal that his admissions during the pre-arraignment interview should have been excluded because obtained during an unreasonable delay in arraignment contrary to the mandate of Fed.R.Crim.P. 5(a). See Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). The failure to object on this ground at trial suffices to preclude this point as a possible basis for appeal. See United States v. Torres, 343 F.2d 750 (2d Cir. 1965); United States v. Ladson, 294 F.2d 535, 538–540 (2d Cir. 1962). Unlike the right to counsel contentions, where the principal judicial decisions post-date Drummond's trial, the McNabb-Mallory interpretation of Rule 5(a) was fully developed and well-known to appellant's counsel at the moment when its invocation was required.

of waiver cannot be divorced from the nature of the crime.[12] It is reasonable to assume that a person of Drummond's background probably had given advance consideration to the best method of extricating himself if apprehended. After being arrested in possession of classified documents in the company of Russian espionage agents, it took him but a few minutes to decide to "spill the beans." These first disclosures were not a response to persistent questioning or, indeed, to questioning of any kind. Drummond offered the information voluntarily then and, again, at his pre-arraignment interview. He initiated a number of interviews thereafter and spent the interludes between them recalling details which might aid the investigation. At the October 2 interview he produced a written plan which he had contrived purportedly to make amends for his past conduct, offering to serve as a counterespionage agent for the United States.

In sum, Drummond's decision to cooperate was not the result of an impetuous act which he later regretted or the product of any physical or mental coercion. It was the initial step in a well-conceived plan through which, it is not unreasonable to assume, he hoped to achieve judicial leniency. Drummond was fully informed of his right to counsel at every interview. To hold in these circumstances that the admissions were unconstitutionally extracted from him would be to mock the court's role in achieving a just balance between society's rights and those of the accused.

*Post-Arraignment Interviews*

■■■ We hold that Drummond also waived his right to counsel during the post-arraignment interviews in the Federal House of Detention on September 29 and October 2, 3 and 4, immediately preceding his indictment. Drummond initiated these interviews himself, was advised of his rights prior to each interview and after the first interview was permitted to call his wife. He was told by the interviewing agent, "Any time you don't want to be interviewed, you just say so and I will not come back here."

We are aware of Drummond's testimony that on September 29, subsequent to the pre-arraignment interview at F. B. I. headquarters but prior to the first post-arraignment interview at the Federal House of Detention, he was twice denied permission to telephone counsel. Based on this, in the main, appellant urges us not to find a waiver on the whole record before us, but to remand to the District Court for a hearing. This course would, in our opinion, be unproductive. If Drummond were able to point to some significant ambiguity in the record, the production of further evidence to clarify it might be in order. But, as appellant's able appellate counsel point out in their reply brief, the facts concerning the alleged deprivation of counsel were fully elucidated during the trial and are before us. Indeed, as we have already noted, Palguta's notes (not to be confused with Palguta's log, see note 4) relating to this interview were introduced into evidence during his cross-examination and have been considered by us on this question.[13] The trial record amply warrants a finding that Drummond waived whatever right might theoretically have been abridged by this incident. Indeed, Drummond's conduct in proceeding enthusiastically and exhaustively to disclose to Palguta further details about his espionage activities reveals that his belated claims lack substance.[14] In the light of all the evidence,

---

12. "Mr. Justice Jackson once observed that he would be willing to give the police greater latitude in setting up roadblocks to catch a kidnapper and protect his victim than 'to salvage a few bottles of bourbon and catch a bottlegger.'" Packer, supra, note 8.

13. See note 5, supra.

14. Although Judge Murphy made no explicit finding of a waiver when he denied defense counsel's motion at the close of the entire case to strike the testimony of Agents Mannion and Palguta concerning the interviews, as well as the written statements given by Drummond, an implicit finding of waiver can be inferred.

principally the testimony of Drummond himself, we see no purpose in remanding for a hearing.

A finding that the statements of September 29th were inadmissible would be particularly disingenuous. It will be recalled that Drummond sought this interview to fill in some of the most important gaps of his prior disclosures to the agents; he had remembered the name of a key American contact and was anxious to reveal it. When the agents received his note requesting a meeting, and explaining what he wanted to tell them, they knew that he had repeatedly been advised of his right to consult counsel and of his privilege to stand mute—not only by the F. B. I. but by the committing magistrate at arraignment. Under these circumstances, they would have been remiss in their duties had they not met Drummond and discovered the additional information he wanted to provide. To paraphrase Justice Jackson, they were dealing with espionage, and not merely "a few bottles of bourbon."

Even so, their first question to Drummond concerned not his American contact, but whether he had an attorney. When Drummond—even if we accept his version—explained that he had not yet been given the opportunity to consult counsel, they again informed him that he had a right to an attorney and to refuse to answer their questions. Drummond's only response was continued cooperation; he read, edited and signed a written version of his earlier disclosures and participated in the further discussions which he had sought.

■ We are not prepared to hold that Drummond's willingness to go on "spilling the beans" was a waiver of some of his rights but not others. The Fifth and Sixth Amendments may be designed to protect quite different values but in concrete situations they may often provide precisely the same protection which can be waived in precisely the same way. On the evening of September 29th, Drummond could have refused to talk to Agents Gamber and Palguta; he would have been protected in such a refusal by the Fifth and Sixth Amendments. But when he *did* elect to speak, his rights under both Amendments were waived. We cannot ignore Drummond's proud acknowledgment at the trial that he "started cooperating [with the government] from the time [he] was arrested," and that he continued to cooperate "from September 28, 1962 up to and including January 21, 1963." On the night of September 29th, Drummond freely stated in writing that he had "requested to be interviewed." Gov't Ex. 56. And, thereafter Drummond proposed "as part of my cooperation with the government" a detailed plan pursuant to which he would serve the government as a counterespionage agent. The record of this case, in short, clearly and unmistakably creates the picture of a man who was not only willing but anxious to talk—a picture wholly at odds with the scene of stationhouse badgering which formed the backdrop for Escobedo. The completed mosaic is consistent with Drummond's concession at the trial, "I had told the agents that I wanted to cooperate * * * that I would be more than happy to do it if it was to benefit the United States Government."

Nor is it material that Drummond, Gamber, Palguta and Judge Murphy may have been unaware of the existence of Danny Escobedo at the time they made their respective decisions. The crucial fact is that Drummond knew that he had a right to counsel. That he may have gained that knowledge from the F. B. I. rather than from the Supreme Court

See Gov't App. at 496a–501a. It is reasonable to assume that Johnson v. Zerbst and the long line of cases dealing with waiver were known to him. Cf. United States v. Winfield, 341 F.2d 70 (2d Cir. 1965). In any event, the Supreme Court long ago made clear that "[i]t would be wasteful to send a case back to a lower court to * * * [formulate] a decision * * * within the power of the appellate court to formulate." S. E. C. v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); see Fassilis v. Esperdy, 301 F.2d 429 (2d Cir. 1962).

can scarcely be determinative. See People v. Stewart, 62 A.C. 597, 43 Cal.Rptr. 201, 400 P.2d 97 (1965); People v. Mathis, 46 Cal.Rptr. 785, 406 P.2d 65 (1965).

### Post-Indictment Statements

██ The court finds that the admissions made by appellant during the December and January interviews were properly introduced at trial. These statements were elicited only after Drummond and his lawyer had conferred and given their consent to interrogation, thus vitiating any reliance on Massiah. The only argument appellant now urges for their inadmissibility is that they should be regarded as the tainted fruit of earlier inadmissible statements. Having held the earlier statements admissible, we obviously reject this contention.

██ But, assuming *arguendo* that some of the earlier statements were barred, the post-indictment admissions could in no way be considered tainted. Two full months passed between the two series of interviews. Although Drummond was in jail during that interval, he consulted freely with his counsel and his wife. The alleged earlier taint could not have marred the fruitful product of Drummond's continued cooperation.

### V. OTHER ISSUES RAISED BY APPELLANT

This appeal was originally argued before a panel composed of Judges Waterman, Smith, and Anderson. With respect to the remaining issues raised on this appeal, we unanimously adopt the relevant portions of the thorough draft opinion circulated by Judge Waterman, in which he disposed of the contentions substantially as follows.

Defendant attacks his conviction on two other grounds not presented below. He claims that the trial court charged the jury erroneously on the issue of whether the conspiracy pertained to documents "relating to the national defense." He also claims that the evidence failed to meet the requirement for a finding of treason, as set forth in the Treason Clause of the United States Constitution, and that the trial court failed to charge the jury on these requirements.

### The Jury Charge

██ 18 U.S.C. § 794 forbids conspiracy to transmit information "relating to the national defense." The government acknowledges that it was for the jury to decide whether the documents defendant conspired to transmit were of such a character. Gorin v. United States, 312 U.S. 19, 31–32, 61 S.Ct. 429, 85 L.Ed. 488 (1941). It seems likewise to be agreed that the jury's finding on this issue depended mainly on its assessment, in the light of the instructions given to it by the trial court, of six documents allegedly found in defendant's car at the time of his arrest.

██ Defendant claims that the trial court defined information "relating to the national defense" only in terms of its availability to the public, and not in terms of its contents as well. On the contrary, the trial court charged the jury, "The term 'national defense' is a generic concept of broad connotation referring not only to military, naval and air establishments but to all related activities of national defense." See Gorin v. United States, 312 U.S. 19, 28, 61 S.Ct. 429, (1941). In addition, the trial court told the jury, "in deciding this issue, you should examine the documents, and also consider the testimony of witnesses who testified as to their content and their significance and who described the purpose and the use to which the information contained therein could be put." Such instructions were more than ample.

██ Defendant argues that the trial court instructed the jury on this issue only in relation to the attempt count of the indictment and not in relation to the conspiracy count as well. However, the trial court did tell the jury that to prove conspiracy, the government had to show: "(2) That Drummond knowingly associated himself with the conspiracy and its criminal purposes, including the delivery of prohibited documents relating to the national defense to the Soviet Union * * *" The phrase "documents relating to the national defense" recurred at several other points in the conspiracy

instructions. Moreover, the trial court had already charged the jury adequately on this issue in relation to the attempt count, and we are satisfied that a jury of ordinary wit could have incorporated that charge by reference.

■■ Defendant also contends that the trial court improperly permitted the jury to view four of the documents without first obliterating or belittling the legend which each of them bore: "This material contains information affecting the national defense of the United States, within the meaning of the Espionage Laws, Title 18, USC, Sections 793 and 794 * * *" However, it was proper to retain this legend because it was relevant to the question whether defendant conspired to transmit the information "with intent or reason to believe" that it would hurt our country or help a foreign nation, as 18 U.S.C. § 794 also requires. Gorin v. United States, 111 F.2d 712, 721 (9th Cir. 1940), aff'd, 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488 (1941). Moreover, to prevent the legend from prejudicing defendant's right to a jury determination on the character of the documents, the trial court warned the jury, "Whether any given document relates to the national defense of the United States is a question of fact for you to decide. It is not a question of how they were marked."

### The Treason Clause

Article III, Section 3 of the United States Constitution in part provides: "Treason against the United States, shall consist only * * * in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." Defendant contends that he was, in effect, convicted of giving aid and comfort to our enemies; that the government did not prove an overt act of treason by the testimony of two witnesses; and that the trial court

erroneously failed to charge the jury on this evidentiary requirement.

■■ It is true that "Congress [cannot] dispense with the two-witness rule merely by giving [treason] another name." Cramer v. United States, 325 U.S. 1, 45, 65 S.Ct. 918, 940, 89 L.Ed. 1441 (1945). But it is also settled that an offense must incorporate all the elements of treason in order for the two-witness rule to apply. United States v. Rosenberg, 195 F.2d 583, 610–611 (2d Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687 (1952). The Treason Clause requires that an accused act with *intent to aid our enemies.* Cramer v. United States, supra. On the other hand, 18 U.S.C. § 794 requires only that an accused transmit information "with intent *or reason to believe* that it is to be used to the *injury of the United States or* to the advantage of a foreign nation." The differences may not be very great between intent and reason to believe, or between injuring our country and aiding our adversaries. But the Supreme Court plainly regards them as sufficient to make the two-witness rule inapplicable, for in Cramer v. United States, supra, 325 U.S. at 45 and n. 53, 65 S.Ct. at 940, it cited the forerunner to 18 U.S.C. § 794 as an example of a crime affecting our national security which is not merely treason by another name. Accordingly, we find it unnecessary to consider an additional distinction urged by the government, that the Soviet Union is not an "enemy" within the meaning of the Treason Clause. See United States v. Rosenberg, supra, 195 F.2d at 610–611.[15]

■ Defendant contends that, irrespective of the statutory definition of the crime for which he was prosecuted, he was actually indicted and convicted for treason. He relies on the fact that the indictment charged him with "intent *and* reason to believe" that the documents would be used "to the injury of the United States *and* to the advantage

15. The government also argues that the evidentiary requirements of the Treason Clause were satisfied at defendant's trial. Although this argument has some merit, there is no need to examine its validity.

of the Union of Soviet Socialist Republics." Even if the indictment charged more than the statute requires, a boon to which defendant can claim no right, the trial court rightly instructed the jury, "the government does not have to prove that the intent was both to injure the United States and to advantage the Soviet Union. The statute reads in the alternative." The same instruction might be given in relation to the statutory requirement of "intent *or* reason to believe."

■ Defendant also relies on the fact that, weeks after the jury verdict and just prior to the sentencing, the trial court implied that he was "a traitor to his country." We fail to see how a single unemphatic remark, made long after the end of a trial commendably free of inflammatory rhetoric, could alter the fundamental character of the crime for which the jury had convicted defendant.[16]

### Motion for New Trial

Defendant's motion for a new trial was based on allegations that his car was unlawfully searched on September 9, 1962, and that he had not discovered this fact until after his trial. Defendant contended that the fruits of the search furnished the principal basis for the arrest warrant issued on September 28, and that his arrest therefore violated the Fourth Amendment of the United States Constitution. He asserted that the documents and other items seized at the time of his arrest, and all of his subsequent incriminating statements to the F. B. I. agents, should have been excluded from evidence as the fruits of an unlawful arrest.

In denying defendant's motion for a new trial, Judge Murphy assumed that the search on September 9 was unlawful, so that there was no need for a hearing on this point. He ruled, in the alternative, that defendant's evidence was not

"newly discovered" within the meaning of Fed.R.Crim.P. 33, and that his arrest was lawful without regard to the allegedly tainted warrant. As we pointed out above in connection with defendant's right to counsel claim, we are reluctant to see a man imprisoned for life as a spy because of evidence arguably obtained in an unconstitutional manner. Consequently, we shall pass over the question of whether defendant's evidence was "newly discovered" and shall proceed directly to the merits of his claim.

■■ F. B. I. agents have statutory authority to make felony arrests without a warrant "if the facts and circumstances known to [them] warrant a prudent man in believing that the offense has been committed." Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). Here, the arresting officers knew, from their own observations and those of their fellow agents, that defendant had taken classified documents from his office after it was closed for the day; that shortly thereafter he had driven to a prearranged meeting with two Soviets in an out-of-the-way spot; and that he had conversed there with one of the Soviets for several minutes. These facts satisfied the statutory and constitutional standards for an arrest without a warrant on a charge of conspiracy to commit espionage.

■ Defendant contends that because he had top secret clearance, no adverse conclusions could reasonably have been drawn from the fact that he took classified documents home with him. This might be so if defendant's job required him to study classified information at his leisure but his duties, were confined to processing and filing such information. Defendant also contends that because the F. B. I. agents lost sight of him for about two and one-half hours after he took the documents, no connec-

---

16. The word "traitor" is a broad, loose and general term applied to one who, without authority, transmits information concerning the National defense—particularly in these perilous times. It is not used to connote the technical treasonous act defined in the Constitution.

tion could reasonably have been drawn between that occurrence and his prearranged meeting with the Soviets. We disagree, having in mind the fact that for a lawful arrest without a warrant, "[e]vidence required to establish guilt is not necessary." Ibid. Defendant also argues that reasonable grounds for the arrest were lacking because defendant and the Soviets were merely conversing, no documents having passed between them. This argument ignores the fact that defendant was arrested for conspiracy to commit espionage and not for the substantive offense.

▄▄ Finally, defendant argues that these grounds, even if otherwise sufficient to justify an arrest without a warrant, were tainted by the alleged illegality of the search of his car on September 9, because it was the success of that search which caused the F. B. I. agents to put defendant under close surveillance. On the contrary, by September 9 the F. B. I. already had defendant, his Soviet co-conspirators, and his office under scrutiny. Moreover, the agents had learned, quite apart from the search, that defendant was visiting an apartment building in which two Soviets resided, and that four classified documents were missing from defendant's office. (They also were sufficiently suspicious of defendant to search his car.) We are satisfied that, even without the allegedly unlawful search, the F. B. I. agents would have intensified their watch on defendant's office, as well as on defendant and his co-conspirators, from September 9 up until the evening of his arrest. Therefore, their observations on that evening were obtained, not "by exploitation of that [alleged] illegality," but "by means sufficiently distinguishable to be purged of the [alleged] primary taint." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

We are grateful to Orison S. Marden, and to his associates, Charles Nelson Brower and P. K. Konrad Knake, Jr., who, as assigned counsel, have represented defendant, in this appeal, with skill and fidelity.

Judgment of conviction affirmed.

LUMBARD, C. J., and MOORE, FRIENDLY and HAYS, concur.

FRIENDLY, Circuit Judge (concurring):

Two of Drummond's contentions as to the use of inculpatory statements warrant additional comment.

The first is his claim that he sought to telephone his wife and his lawyer in the early morning of September 29, 1962, at the beginning of his interview at F. B. I. headquarters, and was refused permission by Agent Palguta—a request which the Government says was made only when the interview was coming to a close. As a result of the understandable lack of findings due to this having been a pre-Escobedo trial, we cannot know whether Judge Murphy rejected Drummond's testimony concerning the time of the request as unworthy of belief, as the judge would have been entitled to do even without rebutting evidence, Dyer v. MacDougall, 201 F.2d 265, 269 (2 Cir. 1952), or believed Drummond but considered his inculpatory statements admissible nevertheless, as almost everyone would have thought at the time. Since on the first view there would be no legal issue whereas the second raises problems of some difficulty, I would prefer to hold this appeal pending a hearing and finding by the judge on this simple point of fact, which might eliminate all legal questions and would illuminate any that remained.[1] Cf. United States v.

1. At such a hearing the Government would surely offer Agent Palguta's log, showing that Drummond's request was made only at the end of the interview, and would call Palguta and possibly other witnesses. Agreeing with my brother Kaufman that

in fairness we ought not to foreclose the Government from presenting such evidence before deciding to order a retrial, see fn. 4 to the court's opinion, I am not convinced that we can properly consider an exhibit that was never offered, even

Santore, 290 F.2d 51, 67–68 (2 Cir. 1959), cert. denied, 365 U.S. 834, 81 S. Ct. 749, 5 L.Ed.2d 744 (1960).

Since a majority cannot be assembled for that course, I think that, for purposes of this appeal, I must accept Drummond's version of the facts, however unlikely it may be. So doing, I join for affirmance, for reasons similar to those expressed in my concurrence in United States v. Cone, 354 F.2d 129 (2 Cir. 1965). The three-hour non-coercive interrogation of Drummond at F. B. I. headquarters in the early morning of September 29 was essential to the investigation of a conspiracy placing the country's very existence in peril. It was imperative for the F. B. I. to find, and to find quickly, who were involved, what damage had been done, and what countermeasures must be taken to avert disaster. Nothing in the language or known purpose of the Assistance of Counsel clause of the Sixth Amendment suggests an intention by the founders that the police must give a man, properly arrested for such a crime, immediate access to family and counsel—with the risk that this may delay or even prevent any meaningful inquiry or alert other participants in a plot against the nation's existence. Neither, despite the statement in Massiah v. United States, 377 U.S. 201, 206–207, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), on the quite different subject of post-indictment interrogation, would I construe the Amendment as requiring that, at this early stage, agents of government may reject a request for access to counsel only under penalty of foregoing use of anything thereafter said by the suspect or its "fruits."

For reasons indicated in my concurrence in United States v. Cone, supra, I do not read the Assistance of Counsel clause of the Sixth Amendment as speaking to such a truly investigative stage at

though the failure to offer it was excusable. It would be better not to create further problems, under Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), which a hearing before Judge Murphy could so readily avoid.

all. The nub of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), is that when any legitimate investigative purpose is nominal as compared with the desire to extract an inculpatory statement, questioning to procure a confession stands no differently in the police station than before a magistrate; in order for the guarantee of the Assistance of Counsel to be truly meaningful, it must extend to a penumbral zone before the "criminal prosecution" has begun and a suspect has been formally "accused." Unless the "penumbra" extends all the way to the point of arrest, which the Court in no way held, the interests of society must be dominant at the beginning of the investigative process, just as the interests of the future "accused" prevail at the end. If the need for saving a kidnapped girl's life justified a failure to warn of the rights to remain silent and to have the assistance of counsel, as Chief Justice Traynor so rightly held in People v. Modesto, 42 Cal.Rptr. 417, 398 P.2d 753 (1965), protection of the nation afforded equal justification for briefly postponing Drummond's access to counsel here. Moreover, even if we assume Drummond made the request to telephone when he said he did, he did not make it clear that granting it was a condition of his willingness to talk.

The post-arraignment interview on the evening of September 29, which forms the subject of the dissents of my brothers Waterman and Anderson, stands on an entirely different legal basis. At this period Drummond had a constitutional right to the assistance of counsel, as decisions available at the time of his trial made plain. Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed. 2d 114 (1961); White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L. Ed.2d 193 (1963).[2] Here too we would

2. Although Hamilton could be distinguished on the basis argued in Judge Anderson's dissent, fn. 2, White cannot be. The arraignment there was not "critical" since White was allowed to change his guilty plea; yet the Court held that what he *said* at that time without the assistance

be assisted by an explicit finding from the trial judge, who saw and heard the witnesses, giving his interpretation of the events. But in this instance we have more evidence—very likely all we ever can have—and, since the right to counsel after arraignment was clear at the time of trial, we can properly assume the judge was satisfied that Drummond had elected to forego it. Drummond had solicited the interview with the F. B. I. agents; when they asked him whether he had an attorney, he responded with a historical reference and proceeded to read, edit and sign the statement and to carry on further discussions with them, all despite an explicit warning of his right to consult a lawyer. If there be an ambiguity in the situation, the judge's resolution of this in the Government's favor surely was not clearly erroneous.[3]

WATERMAN, Circuit Judge (dissenting):

I dissent.

The defendant in the present case was tried and convicted in the summer of 1963 prior to the decisions of the United States Supreme Court in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). His appeal from the conviction was pending when these cases were decided. In the spring of 1965 a division of this court, consisting of the three judges who dissent from the affirmance of the conviction, heard oral argument and agreed that, on the present record made before these two cases were decided, the teachings of Massiah and Escobedo precluded an affirmance because appellant had been deprived of rights rightfully his under the U. S. Constitution. A panel opinion, which I authored, never was operative because of the decision of the full court to consider the case in banc.

Now a majority of the full court, sitting in banc, affirm the defendant's conviction. After careful deliberation and respectful consideration of my brothers' beliefs, I have concluded that the panel result reached several months ago remains the only result that can be reconciled with the opinion of the Supreme Court in Escobedo. No constructive purpose would be served by appending my lengthy opinion as a dissent to the majority opinion of the court in banc. Nevertheless, it *is* important to restate in smaller fashion what was said several months ago on the issue of the protection afforded Drummond by the assistance of counsel clause of the Sixth Amendment during the interrogation that took place at the Federal House of Detention on the evening of September 29, 1962, and on the further issue whether Drummond's conduct during this interrogation "waived" this protection.

We of the erstwhile Drummond panel unanimously concluded then, and we continue to believe, that Drummond was

---

of counsel could not be used against him. And, quite apart from the light later shed by Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), there could be no real doubt that these decisions applied to out-of-court interrogation of an arraigned prisoner by the police or the prosecutor.

3. Although a contrary argument could be constructed on the basis of the Court's listing "the police have not effectively warned him of his absolute constitutional right to remain silent," 378 U.S. at 491, 84 S.Ct. at 1765, as a critical factor, I agree with Judge Waterman that the Sixth Amendment right recognized in Escobedo goes beyond the protection with respect

to interrogation afforded by the self-incrimination clause of the Fifth. Indeed, as to the post-arraignment questioning here at issue, Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), had already made that clear. The case he poses—of an intelligent prisoner who, after arraignment, repeatedly demands counsel but, after thorough warning, continues to answer questions—would be a difficult one; presumably the critical issue would be whether it was made clear that he had the right to consult counsel before answering rather than later. But the very statement indicates that such a case is not too likely to arise; and the judge was warranted in thinking it was not presented here.

entitled to the assistance of counsel during the interrogation by agents Palguta and Gamber on the evening of September 29, when he did not, in fact, enjoy that assistance. Furthermore, we recognized then, and do now, that Drummond requested permission of agents and employees of the Government to telephone a lawyer on at least three occasions, and that his requests were each time refused: first, during the initial interview in the early morning of September 29;[1] second, while he was at the Federal Courthouse later that morning awaiting his appearance before the U. S. Commissioner for his initial examination; and third, after he had been locked in the Federal House of Detention after that appearance. We also noted that when, on the evening of September 29, the F. B. I. agents were told by the defendant that he had been denied the opportunity earlier in the day to obtain counsel, they shrugged off any responsibility to assist him.[2] Finally, we recognized then, and we do now, that after Drummond's requests to reach counsel had been thrice denied he made several damaging admissions, and signed a written version of the inculpatory statements he had made the night before. And we went on to characterize Drummond's conduct at this juncture as "patently voluntary." We could not, however, find an easy equation between Drummond's voluntary admissions on the evening of September 29 and a waiver by him of his constitutionally protected right to counsel at that time, inasmuch as he continued to request access to counsel and his requests were repeatedly denied. We remain of the same belief.

The majority's opinion, insofar as it relates to the interrogation on the evening of September 29, is expressed in terms of waiver, but in actuality it rests on an extremely restrictive reading of the Supreme Court opinion in Escobedo. This restrictive approach is most clearly disclosed by Judge Kaufman's statement that "[t]he Fifth and Sixth Amendments may be designed to protect quite different values but in concrete situations they may often provide precisely the same protection * * *." I do not now deny that in some cases the protection afforded an accused by the right to counsel may be no broader than that afforded by the privilege against self-incrimination; that is, the right to keep silent. But the majority errs when they suggest that in the present case the protection conferred by the Sixth Amendment as explicated in Escobedo was identical with that conferred by the Fifth Amendment.

If Escobedo changed the law regulating the admissibility of the out-of-court inculpatory statements of an accused, the decision must mean that, at least in some instances of police interrogation, an accused has a right not to be questioned in the absence of counsel *in addition to* a right to remain silent, and that police respect for the former right is a precondition of admissibility at trial of inculpatory statements. Compare Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) with Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958). See Friendly The Bill of Rights as a Code of Criminal Procedure, 53 Calif.L.Rev. 929, 949 (1965). And one such instance surely must be when the

1. The factual circumstances of Drummond's first request for counsel are unclear. Given the present posture of this case, I agree with Judge Friendly that one must accept Drummond's version of the facts relating to this request.

2. The majority pretend that Drummond did not again ask for counsel prior to the interrogation on the evening of September 29. I disagree. When asked whether he had an attorney Drummond

told agents Palguta and Gamber that he had repeatedly sought an opportunity to contact counsel and each time he had been rebuffed. If Drummond assumed that the F. B. I. agents would allow him an opportunity to consult with counsel before they proceeded to interrogate him he certainly would have believed that his tale of frustration would be understood by the agents as a request for an opportunity to consult with counsel.

accused repeatedly requests an opportunity to consult with counsel; for the very fact of repeated requests suggests that the accused, without assistance, is unable to preserve his right to be silent in the face of the sophisticated interrogation techniques of the police.

It has, of course, been claimed that the Sixth Amendment as explicated by the decision of the Court in Escobedo confers no such "extra" right to counsel if the interrogators effectively warn the accused of his right to remain silent.[3] In the present case the F. B. I. did warn the accused that he had both a right to remain silent and a right to seek the advice of counsel before they began to question him on the evening of September 29. It might therefore be argued that after Drummond had been warned his only remaining protection was that afforded by the privilege against self-incrimination; that is, the right to remain silent. This argument might be persuasive in the case of a reasonably intelligent accused who is adequately warned he has the right to remain silent and to seek the advice of counsel and who, unlike Drummond, makes no effort to implement that latter right. The same argument is not persuasive in the case of a reasonably intelligent accused who is adequately warned he has the right to remain silent and to seek the advice of counsel, and who repeatedly requests, as Drummond did, that he be allowed to consult with counsel in an effort to avail himself of that right. To say that in the latter case the Sixth Amendment confers on the accused no more protection than does the Fifth Amendment is to deny that Escobedo has any relevance in the very case in which an accused vigorously seeks counsel and is rebuffed repeatedly. If Escobedo does not apply in such a case one may well ask if it has any relevance at all. I would hold that when prior to a police interrogation, an accused vigorously seeks the opportunity to consult with counsel, Escobedo requires that he be afforded the opportunity to do so. I

would hold further that the present case is just such a case. To this extent, at least, Escobedo must be read as overruling Crooker v. State of California, supra. The scope of the right to counsel may still be uncertain, but to suggest that the Sixth Amendment as explicated by Escobedo did not confer on Drummond the right not to be questioned in the absence of counsel when he requested counsel, in addition to the right to remain silent, seems to me "particularly disingenuous."

I thus come to the question of whether Drummond waived the "extra" right afforded by the Sixth Amendment, as later explicated by Escobedo, not to be questioned in the absence of counsel. Two slightly different grounds to support its finding of waiver appear to have been advanced by the majority. Neither is persuasive.

First, it is argued that because Drummond made several voluntary inculpatory statements to the F. B. I. agents immediately after he was arrested, and voluntarily disclosed other inculpatory facts during the preliminary interrogation at F. B. I. headquarters before he for the first time requested counsel, these voluntary utterances waived any Sixth Amendment right he might have had. Of course this argument ignores the critical fact that all of these early voluntary admissions were made prior to the first of Drummond's repeated requests for an opportunity to contact counsel and, as I have previously stated, it was these repeated requests that gave Drummond the Sixth Amendment right not to be questioned in the absence of counsel. Drummond's admissions prior to the time of his repeated requests may well be admissible against him at his trial, but the fact that he said them can hardly constitute an advance waiver of a right that, on the facts of this case, was not at that time available to him and which arose after the admissions had been made.

Second, it is argued that Drummond voluntarily made later inculpatory state-

3. Note: 53 Calif.L.Rev. 337, 349 (1965).

ments during the interrogation on the evening of September 29 and that these admissions constitute a waiver of any Sixth Amendment right he had. The majority tells us that if Drummond wished to avail himself of the protection afforded by the Sixth Amendment he should have refused to talk to agents Gamber and Palguta. The short answer to this position is that, as we have seen, the Sixth Amendment afforded Drummond in addition to his Fifth Amendment right to remain silent the further right not to be questioned in the absence of counsel. The court surely cannot justify its assumption that Drummond in talking and waiving the former right *intended* to waive the latter as well. And, as I shall subsequently point out, if the Sixth Amendment right not to be questioned in the absence of counsel is to be given any real meaning, the utterance of inculpatory admissions under those circumstances and in that setting cannot be a waiver of that right as a matter of law.

The portion of the majority's opinion that suggests that Drummond *intended* to waive his Sixth Amendment protection during the interrogation on the evening of September 29 is especially strained. When this interrogation occurred Escobedo had not been decided. Therefore, even though Drummond was warned of his "right to counsel" at the start of this interrogation it is quite unlikely that he understood this quick phrase to signify that if he pleased he was entitled at once to talk with a lawyer. One is required to give Drummond the benefit of the doubt, and to hold that he did not waive his "extra" Sixth Amendment right because he would not consciously and willingly have surrendered this right not to be questioned in the absence of counsel if he had known on the evening of September 29 what Escobedo subsequently made apparent. United States ex rel. Noia v. Fay, 300 F.2d 345, 351 (2 Cir. 1962), aff'd on other grounds, 372 U.S. 391, 83 S.Ct. 822, 9 L. Ed.2d 837 (1963). See Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962); Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1937). There will be time enough to consider what constitutes an intentional waiver of the right not to be questioned in the absence of counsel when we are presented with a case involving a post-Escobedo interrogation of an accused who is properly apprised that such a right is his if he chooses to exert it.

I come finally to consider whether Drummond's utterance of inculpatory statements can be regarded as a waiver of his Sixth Amendment right as a matter of law. I maintain that, demonstrably, they cannot be so regarded. The established rationale of the constitutional right to counsel is that this "extra" constitutional protection is sometimes essential if the accused's constitutional right to silence is to have meaning. One who, after repeatedly requesting access to counsel and repeatedly finding that no attention is paid to his requests, confesses, may have effectively waived his constitutional right to maintain silence but surely has not waived his extra right to have counsel's advice before breaking silence. To hold here that, because he talked, Drummond, regardless of his expressed wishes, waived his Sixth Amendment right is to eliminate that right altogether—and under circumstances that clearly establish that the right is indeed a separate right, and under circumstances where the accused, being confined and under arrest, needed the protection the most. We need not now decide what would constitute an effective waiver of an accused's right to counsel once the right has attached and the accused has taken steps to be protected thereby. Whatever ultimately is held to constitute waiver by an accused in such circumstances, it is clear that if Escobedo is to have any independent significance, the making of inculpatory statements by an accused after he has sought an opportunity to reach counsel and has been prevented from doing so cannot constitute it.

I would reverse and remand for a new trial at which the inculpatory statements

elicited from Drummond during the evening interrogation of September 29, 1962 would be excluded from evidence.

Whether Drummond's subsequent inculpatory statements should not also then be excluded will depend upon whether it should develop at that trial that they were given independently of the compulsion activated by the September 29 statements.

SMITH, Circuit Judge (dissenting):

I dissent. I agree generally with the dissenting opinion of Judge Waterman, except that I would not make the incidence of the right not to be interrogated in the absence of counsel depend on a request. For the reasons set forth in my dissents in United States v. Robinson, 354 F.2d 115 and United States v. Cone, 354 F.2d 132, I would hold that since, after Drummond's volunteered statements to the agents the night of September 28, the investigation had fully focused upon him, the trial use against him of the results of his further interrogation without according him his Sixth Amendment right to counsel was error under the Escobedo case. I agree with Judge Waterman and Judge Anderson that there is no sound basis in the record for this court to construct a finding of waiver by Drummond of his right to counsel. I would reverse for new trial.

ANDERSON, Circuit Judge (dissenting):

I dissent from the holding of the majority that Drummond, at his interrogation by F. B. I. Agents Palguta and Gamber, between 7 and 9:30 p. m. on September 29, 1962, following his initial arraignment before the United States Commissioner, waived his right to have the assistance of counsel.

The circumstances surrounding this interrogation bring it within the holding of the Supreme Court in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). The Government agents had in hand ample evidence to establish the corpus delicti and enough in Drummond's oral confession,

given early that morning, to sustain a conviction. It was, by that evening, certainly no longer a general inquiry into an unsolved crime and had definitely focused upon Drummond as a self-confessed accused. Although the Government urges that the continued process of interrogation was for the purpose of ascertaining the scope of the espionage activity in the interests of national security and while to a great extent this was undoubtedly so, the evidence obtained in the interrogation was used at Drummond's trial to convict him. All of the elements on which Escobedo was based are present in Drummond's case as it stood during the evening of September 29th, 1962, with the exception of the fact that Drummond was warned of his Fifth and Sixth Amendment rights and Escobedo was not. But it is not reasonable to suppose that the Supreme Court intended that the holding of Escobedo would not apply if that single factor were missing, particularly where, as here, Drummond had made it clear that he wanted to retain counsel. Drummond testified that he tried three times to get in touch with a lawyer to represent him. Once toward the end of the first interview with the agents at about 3:30 a. m., September 29th he says he asked to call his wife and a lawyer. As to this, Agent Palguta's notes in his log disclose that Drummond asked to call his wife but was refused because he was about to be taken before the Commissioner. Drummond claims that he again asked to call a lawyer, while he was at the Courthouse, just before his first arraignment. This is not corroborated by any notes of the agents. Drummond again attempted to call a lawyer after his return to the House of Detention, but the officials in charge refused him permission to do so. At 7:05 p. m. at the evening interview, when Drummond was warned of his right to counsel, he told the agents of his thwarted efforts earlier in the day to call a lawyer. Palguta's log reflects this as stated in footnote five of the majority opinion, but the agent felt it was no concern of his at that time and did nothing

to afford Drummond the opportunity to use a telephone.

The majority opinion does not specifically concede or deny Drummond's right to the assistance of counsel at that stage of the investigation, under the holding in Escobedo. It avoids an interpretation and application of that case to the facts of the present case, and does not attempt fully to distinguish it. The majority do grant that "* * * the denial of a request to call counsel during a pre-arraignment interview may, in other circumstances, render any incriminating statements inadmissible." They then go on to say that the "other circumstances" would be the absence of those facts present in Drummond's case which are: that he is "an intelligent defendant, fully warned of his rights [who] nevertheless clearly evinced a strong desire to co-operate and made elaborate disclosures before his earliest request for counsel * * *." But this is tantamount to saying that if an accused plainly and emphatically waives his Fifth Amendment right against self-incrimination, he thereby, *ipso facto,* waives his Sixth Amendment right to the assistance of counsel—a proposition which is untenable on its face.

In concluding that Drummond was not deprived of his Sixth Amendment right to counsel, the majority's principal reliance is upon the theory of waiver. In effect, they are saying that, in pursuit of a carefully thought-out plan of his own to avoid disaster, or at least mitigate his punishment, by pretending to have engaged in a private and harmless effort, as a patriotic citizen, to trap Soviet spies, and driven by an overwhelming emotional compulsion to tell all, Drummond was insistently cooperative with Government agents; and that Drummond's affirmative efforts to disclose all he knew were so undeniably voluntary that they operated as a complete waiver, not only of all Sixth Amendment rights that Drummond then knew that he had, but any which might be discovered in the future, as occurred through the holding in Escobedo.

The difficulty with the waiver theory is that at the beginning of the interrogation by the agents on the evening of September 29th, Drummond made it expressly clear that he wanted a lawyer, and at no time then or thereafter did he say or imply that he didn't want one. It is true that, in spite of not having one present, Drummond went on, without hesitancy or objection, answering questions by the agents.[1] While this might constitute a waiver of his right against self-incrimination, it cannot be taken as a waiver of a right to counsel in the face of his express declaration that he wanted counsel. The majority note the accepted, basic, legal requirements for waiver: that it can have validity only if it represents an intentional relinquishment or abandonment of a known right or privilege; that it must be done intelligently and knowingly; and that courts indulge every reasonable presumption against waiver of fundamental constitutional rights. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962) which requires a showing that an accused was offered counsel and that he intelligently and understandingly rejected the offer; and Escobedo v. State of Illinois, supra. They find all of these conditions fulfilled by the post-warning voluntary disclosure by Drummond of additional in-

1. It should be noted that Drummond's message to the agents, asking them to see him on September 29th, was simply to give them the name of Esther Katz to whom he had referred in his previous statements, but whose name he had then been unable to recollect, and also to show them on a map the place where he thought the camp was located. The incriminating statements which Drummond gave in addition were brought out by the agents' interrogation of him in making the most of the opportunity the visit afforded them. Though he apparently answered willingly, he did not beckon the agents for the purpose of insisting upon giving them this additional information. These circumstances disclose precisely the kind of situation in which Escobedo holds the right to counsel necessarily attaches.

criminating statements during the evening of September 29th, in spite of his clearly enunciated assertion that he wanted a lawyer. With this conclusion I must disagree. Moreover, it is far from clear how, on the present record of the case, Drummond could be said to have relinquished a known right to the assistance of counsel on the 29th day of September, 1962, when no one knew such a right existed until the Escobedo decision on June 22, 1964.[2] As this is a pending case it does not seek a retroactive application of the Escobedo holding.

Perhaps what was done or not done by all concerned with Drummond's express desire on September 29th, 1962, to have a lawyer, including Drummond's failure to insist on having one before confessing further, is explained by the fact that no such right was recognized or known on that date; and what the agents meant, and what Drummond thought, was that he was entitled to a lawyer for the formal proceedings in court but not for the investigative stage, once he was regarded as "an accused." Perhaps that is all Drummond was asking for, but, from the record before us, it would be reasonable to presume that he wanted to consult one at the time he was asking for one. In any event, this court is in no position to say.

As Judge Kaufman so cogently stated in a recent but pre-Escobedo case, United States ex rel. Durocher v. LaVallee, 2 Cir., 330 F.2d 303, 310 (1964),

"Where, as here, petitioners allege that they were unaware of their right to counsel, that they were never so advised, and that, in fact, the Supreme Court did not recognize their right until after their convictions, a finding of waiver would border on the fanciful."

While it may be said that this case is distinguishable because Drummond was advised of his right to counsel, the facts here are even more compelling because Drummond said he wanted counsel—a combination of circumstances which places a finding of waiver in the present case, as the record now stands, in the realm of the fantastic.

Obviously the trial court never had an opportunity to evaluate the evidence and such factual conclusions as it might have reached in the light of Escobedo. The Government in its brief concedes that the record is incomplete for the purpose of passing upon the issue of waiver. The case should therefore be remanded to the trial court for a finding and ruling on this matter. If the court below concludes that Drummond did not waive his right to the assistance of counsel at the interview from 7 to 9:30 p. m. on September

2. I must differ with the view, which my brother Friendly suggests in his concurring opinion, that, by the evening of September 29th a right to counsel had attached under the rule laid down in Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), which preceded Drummond's interrogation, and White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963), which followed it. In Hamilton and White the right to counsel attached, not simply because the defendants were brought before a magistrate for arraignment, but rather because the state laws required that the accused enter a plea at the arraignment which made it "a critical stage in a criminal proceeding." Hamilton v. State of Alabama, supra, 368 U.S. at 52, 82 S.Ct. at 157; White v. State of Maryland, supra, 373 U.S. at 60, 83 S.Ct. at 1051. In the present case, even though Drummond was taken before the United States Commissioner in the early hours of September 29th, he was not required to enter any plea nor did anything occur which might indicate that the proceedings had reached a "critical stage." In fact, all that happened at the brief hearing before the Commissioner was that bail was fixed and a date for the postponed hearing was set. Hamilton and White were based upon a finding totally absent from the circumstances of the initial, inconclusive and incomplete arraignment in this case, namely that "Only the presence of counsel could have enabled this accused to know all the defenses available to him and to plead intelligently." 368 U.S. at 55, 82 S.Ct. at 159; 373 U.S. at 60, 83 S.Ct. 1050. Therefore Drummond's right to the assistance of counsel in the evening of Sepetmber 29, 1962, depends solely upon the holding in Escobedo.

29th, 1962, then Drummond is entitled to a new trial. The trial court would also have to pass upon the issue of waiver as it concerned Drummond's alleged request to call counsel at about 3:30 a. m., September 29th. I agree with the majority that even if the trier found Drummond's story to be true, all of his oral admissions, made prior thereto, would not be rendered inadmissible.